**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**Michael D. Huse**

     **v.**

Case No. 08-cv-71-PB
Opinion No. 2008 DNH 178

**Michael J. Astrue, Commissioner,
US Social Security Administration**

**MEMORANDUM AND ORDER**

Michael Huse has sued the Commissioner of the Social Security Administration in an effort to overturn the Commissioner's denial of his application for Social Security Disability Insurance Benefits ("DIB").  Huse's principal argument is that the presiding Administrative Law Judge ("ALJ") failed to properly account for Huse's mental impairments when he determined Huse's residual functional capacity ("RFC").  According to Huse, this mistake requires that the case be remanded because it caused the ALJ to improperly use the medical vocational guidelines (the "Grid") rather than a vocational expert to determine that Huse was not disabled.  Because I agree with these arguments, I vacate the Commissioner's decision and remand the case for further proceedings.

# I. <u>BACKGROUND</u>[1]

## A. <u>Procedural History</u>

On September 7, 2005, Huse filed an application for DIB, alleging an onset date of April 1, 2005. <u>Tr.</u> at 55-57. This application was denied initially and upon reconsideration. <u>Id.</u> at 23-27, 31-33, 36-38. Thereafter, Huse requested a hearing, which was held before ALJ Robert S. Klingebiel on April 12, 2007. <u>Id.</u> at 39-40, 403-47. At the hearing, Huse was represented by counsel and both he and Tamara Sipitkowski, his girlfriend, testified. <u>Id.</u> at 403-47.

On July 20, 2007, the ALJ denied Huse's claim. <u>Id.</u> at 12-22. Although the ALJ found that Huse suffered from a major depressive disorder and a back injury, he concluded that Huse was not disabled because he had the RFC to perform light work that did not involve regular interaction with others. <u>Id.</u> Further, the ALJ found that although Huse was unable to perform any past relevant work, he was able to engage in other work that existed in significant numbers in the national economy. <u>Id.</u>

---

[1] The background information is drawn from the Joint Statement of Material Facts (Doc. No. 13) submitted by the parties. Citations to the Administrative Record Transcript are indicated by "<u>Tr.</u>"

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Huse's request for review on January 19, 2008.  Id. at 7-9.

B.    **Huse's Education and Work History**

Huse was 39 years old when the ALJ denied his application on July 20, 2007.  Id. at 21, 55.  He completed two years of college.  Id. at 96.  His past relevant work experience was as a truck driver.  Id. at 85, 93.

C.    **Medical Evidence**

The administrative record contains detailed medical information and diagnoses by various doctors of Huse's physical and mental impairments from 1999 to 2007.

In February 1999 and for six days in September 1999, Huse was treated at Dartmouth Hitchcock Medical Center for major depressive episodes.  Id. at 292-94,332-41.  In April 1999, Huse was referred to the Hitchcock Pain Clinic following complaints of chronic pain at the site of a prior hernia repair.  Id. at 110. Upon exam at the Clinic, Dr. Robert J. Rose noted that Huse appeared depressed and had a somewhat confrontational attitude, but exhibited no pain symptoms.  Id. at 111-14.

In January and February of 2001, Huse visited Dr. Kristine A. Karlson, who diagnosed him with left knee and right shoulder

-3-

pain and prescribed a strengthening program and orthotics.  Id. at 121-22.  On March 14, 2001, Brian S. Kimball, a physician's assistant, examined Huse, who complained of respiratory illness. Kimball diagnosed Huse with acute back pain in his thoracic spine, most consistent with a muscular origin.  Id. at 128-29.

On June 14, 2001, Huse returned to Dr. Karlson complaining of left shoulder pain.  Id. at 133.  Dr. Karlson diagnosed Huse with left shoulder rotator cuff tendonitis and prescribed physical therapy.  Id. at 126.  On June 20, 2001, Huse complained to Dr. Karlson of continuing left shoulder pain.  Id. at 134-35. Dr. Karlson treated Huse with a steriod injection and prescribed continuing physical therapy.  Id.

On August 7, 2001, Dr. Jonathan Ross performed a general medical examination of Huse, who complained of left shoulder and left knee pain, as well as right shoulder joint problems.  Id. at 138-39.  Dr. Ross assessed Huse to be in generally good health, with the probability of continuing musculoskeletal problems from pushing his body hard.  Id. at 139.  The doctor noted that no further interventions were needed at that time.  Id.

Kimball examined Huse again on April 12, 2002 and noted that Huse had symptoms of depression with associated sleep disturbance.  Id. at 140.  Kimball prescribed Zoloft to address

-4-

Huse's symptoms.  Id.  During a follow up visit with Kimball on April 16, 2002, Huse complained of depression and noted some side effects of Zoloft, but also reported positive effects from the drug.  Id. at 142.  Kimball noted that Huse's depression was improving and recommended an increase in Zoloft.  Id.

On May 28, 2002, Dr. Ross again examined Huse, who complained of depression and insomnia.  Id. at 144.  Dr. Ross diagnosed Huse with depression that responded to medication, and opined that he needed counseling, medication adjustment, and coffee reduction.  Id.

On June 5, 2002, Thomas O. Wansleben, a physician's assistant, examined Huse and treated him with Albuterol for asthma.  Id. at 146.  On October 16, 2002, Wansleben again examined Huse following symptoms of syncope and memory loss.  Id. at 150-51.  Wansleben evaluated Huse as being an "anxious young man and somewhat difficult to assess."  Id. at 150.  A magnetic resonance imaging ("MRI") study of Huse's head on November 1, 2002 revealed normal findings, other than a mucus retention cyst. Id. at 152.

On November 20, 2002, Dr. Robert J. Ferguson examined Huse, who complained of psychosomatic symptoms.  Id. at 155.  Dr. Ferguson diagnosed Huse with an unspecified anxiety disorder and

-5-

noted that he would likely benefit from psychotherapy focusing on stress management, expression of emotion, and coping strategies. Id.  On December 4, 2002, Huse returned to Dr. Ferguson and complained of stress and anxiety.  Id. at 156.  Dr. Ferguson encouraged Huse to follow-up on referrals and practice progressive muscle relaxation daily.  Id.

On December 28, 2002, Wansleben examined Huse, who complained of shortness of breath, and prescribed Alburterol for asthma.  Id. at 157-58.  On February 9, 2004, Wansleben again saw Huse, who complained of anxiety, increased pressures from his job and home life, and trouble with his anger.  Id. at 166-67.  Huse was diagnosed with a long-standing history of anxiety disorder, with a probable depressive component and increased symptoms.  He was instructed to increase his Wellbutrin.  Id. at 166.

On April 28, 2004, Dr. Richard D. Whiting examined Huse, who complained of back pain, and diagnosed him with lower back pain, possibly orthotic related.  Id. at 170-71.

On January 1, 2005, Dr. Marcus J. Hampers examined Huse, who complained of back pain.  Id. at 172-73.  Dr. Hampers diagnosed Huse with lower back pain, likely related to a herniated disc, and prescribed him Percocet and non-steroidal medications.  Id. at 172-73.

-6-

On January 4, 2005, Dr. Edward J. Merrens saw Huse, who complained of pain in his left calf.  Id. at 174-75.  Upon exam, Huse was in no apparent distress and was diagnosed with calf pain and a possible recent disc herniation that was better, with normal sensation and function and a perception of numbness.  Id. Dr. Merrens prescribed ibuprofen and Percocet.  Id.

On February 3, 2005, Dr. Robert K. McLellan examined Huse, who complained of weakness and numbness in his left leg.  Id. at 176-78.  Huse was diagnosed with back pain and radiculopathy at level S1, probably secondary to a herniated disc at level L5-S1, and prescribed Ultram.  Id. at 177.  Dr. McLellan saw Huse again on February 17, 2005 following complaints of weakness and numbness in the back and left leg.  Id. at 179-82.  Huse was diagnosed with back pain and radiculopathy at level S1 and prescribed Ultram, and epidural steroid injection.  An MRI of his back revealed a herniated disc at level L5-S1.  Id. at 179, 181-82.

On March 17, 2005, Ms. Nancy Yazinski, a registered nurse practitioner, examined Huse, who complained of back pain.  Id. at 183.  Huse was diagnosed with a herniated disc in his lumbar spine and limited to modified duty at work, which included lifting twenty-five pounds maximally and ten pounds frequently;

-7-

an inability to climb a ladder greater than five feet; and only occasional bending and squatting.  Id.

On April 1, 2005, Dr. McLellan saw Huse because of complaints of low back and leg pain, weakness and numbness.  Id. at 184.  Dr. McLellan determined that it was necessary to remove Huse from the workplace and placed him in a physical therapy program.  Id.  From April 8, 2005 through May 6, 2005, Huse participated in a physical therapy program at Dartmouth Hitchcock Medical Center, aimed at work conditioning.  Id. at 184-200, 204-05.

On April 25, 2005, Huse received a steroidal injection in his lumbar spine.  Id. at 197.  On May 13, 2005, Dr. McLellan noted that Huse did not benefit from his most recent steroidal injection in the lumbar spine, and recommended that he undergo a discectomy.  Id. at 207.  On May 16, 2005, Dr. Perry Ball examined Huse, who complained of back and left leg pain.  Id. at 208-09.  Dr. Ball informed Huse of the risks involved with a discectomy, and Huse expressed his desire to proceed with the surgery.  Id.  On May 24, 2005, Huse underwent a discectomy at level L5-S1.  Id. at 210-14, 295-301.

On July 20, 2005, Dr. Ross examined Huse, who complained of a fair amount of back pain, and prescribed physical therapy and

-8-

Vicodin.  Id. at 214.  From August 23, 2005 through October 4, 2005, Huse participated in a physical therapy program at Dartmouth Hitchcock Medical Center.  Id. at 216-17, 221, 223-29, 233-34, 237-38, 241.

On August 29, 2005, Dr. Ball met with Huse and noted that his radicular pain was mostly resolved but that he still had a fair amount of back pain.  Id. at 218.  In addition, Huse complained to Dr. Ball of multiple financial and social stressors and was discouraged about his situation.  Id.  Huse also visited Dr. McLellan on August 29, 2005 and complained of back pain, depression, and anxiety.  Id. at 219-20, 222.  Dr. McLellan diagnosed Huse with status post discectomy and difficulty adjusting to his current work status, which precipitated his depressed mood.  Id. at 219.  Huse was prescribed Wellbutrin and Vicodin and found to have no work capacity at that time.  Id. at 219-20.

On September 6, 2005, Birgit Ruppert, a physical therapist, reported that Huse's symptoms had lessened since his surgery but that he had shown no recent improvement in his functional status. Id. at 223-24.  Ruppert noted that Huse had lost a great deal of trunk range of motion and strength and lower extremity flexibility.  Id. at 223.

-9-

On September 22, 2005, Dr. Lewis Sussman performed a psychological evaluation of Huse during which it was observed or Huse reported that he had normal energy and motivation; a "shot" memory; concentration and attention that was impaired by mood and pain; a very angry, discouraged, frustrated and depressed mood; and psychomotor agitation.  Id. at 230-32, 358-60.  Dr. Sussman diagnosed Huse with an adjustment disorder with mixed anxiety and a depressed mood, and a Global Assessment of Functioning ("GAF") score of 55; advised him to consult with his medical providers about receiving anti-depressant and anti-anxiety medication; and found him to be a good candidate for cognitive-behavioral counseling.  Id.

Also on September 22, 2005, Huse visited Dr. McLellan, who stated that Huse had not made substantial functional progress and continued to show fearfulness around increasing activity.  Id. at 235.  Dr. McLellan felt Huse was having difficulty coping with his pain, as well as other stressors in his life, and recommended Wellbutrin for Huse's psychiatric symptoms and participation in function assessment and a functional restoration program.  Id.

On September 29, 2005, Dr. McLellan saw Huse, who complained of agitation.  Id. at 239-40.  Dr. McLellan stated that Huse's psychological status continued to be a barrier to his full-time

employment.  Id. at 239.  Huse was diagnosed with an adjustment
reaction to his discectomy, with mixed emotional features, as
well as agitation as a side effect of his Wellbutrin.  Id.  Dr.
McLellan instructed Huse to decrease his Wellbutrin and to take
Trazodone.  Id.

On October 5, 2005, Dr. Sussman performed another
psychological evaluation of Huse to determine whether the
Functional Restoration Program ("FRP") would help Huse achieve
his functional goals.  Id. at 242-44.  Dr. Sussman concluded that
Huse's significant cognitive side effects from his medications
were a barrier to his participation in the FRP.  Id. at 244.

During a functional assessment on October 7, 2005, Dr. Ross
opined that Huse could lift no more than twenty pounds
occasionally and ten pounds frequently, and that he was a
candidate for a multi-disciplinary intensive physical
rehabilitation program with a behavioral support group.  Id. at
245-47.  Dr. Ross stated that the functional assessment showed
that Huse had physical limitations in range of motion,
cardiovascular endurance, functional strength, and overall
physical capacities that interfered with his ability to perform
basic functional tasks and activities of daily living that

affected his quality of life.  Id. at 247.  The Spine Center at Dartmouth Hitchcock Medical Center also noted in the functional assessment study that Huse had psychological symptoms that were barriers to reaching his goals.  Id. at 248.

From October 7, 2005 through November 11, 2005, Huse participated in a FRP at Dartmouth Hitchcock Medical Center.  Id. at 248-50, 252-81, 355-57, 361.  Huse was discharged from the program without completing it because he was not psychologically in a position to participate.  Id. at 281.  He was not able to progress at a level that would allow him to meet his goals of returning to work.  Id.

On October 12, 2005, Dr. McLellan saw Huse, who complained of agitation.  Id. at 251.  Huse was instructed to discontinue using Wellbutrin and Trazodone, and to take Lexapro.  Id.

On October 17, 2005, Occupational Therapist Virginia Reeves assessed Huse as being able to lift ten pounds frequently and 15 pounds occasionally with a light work demand level.  Id. at 252-54.  And on November 8, 2005, Dr. Rowland G. Hazard assessed Huse as being able to lift more than ten pounds and as having a sedentary work demand level.  Id. at 269-71.

On November 16, 2005, Dr. McLellan examined Huse, who complained of back pain and occasional tingling in his left leg. Id. at 282-83.  Huse was diagnosed with status-post discectomy at level L5-S1, which had reached a maximum medical improvement, and ongoing depression and anxiety.  Id.  Dr. McLellan opined that Huse had a physical work capacity but that his emotional health was a disabling barrier to his returning to the competitive workplace environment.  Id.

On December 12, 2005, Dr. Edward Hurley, a non-examining state agency psychologist, completed a Psychiatric Review Technique Form ("PRTF"), in which he opined that, due to an adjustment disorder, Huse had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  Id. at 302, 305, 312.

Dr. Hurley also completed a Mental Residual Functional Capacity Assessment ("MRFCA"), in which he determined that Huse was moderately limited in his ability to: (1) understand, remember, and carry out detailed instructions; (2) complete a normal workday or workweek without interruptions from

-13-

psychologically based symptoms; (3) perform at a consistent pace without an unreasonable number and length of rest periods; and (4) interact appropriately with the general public. Id. at 316-18, 448. However, Dr. Hurley determined that Huse retained the social capacity for routine interactions with supervisors and coworkers, the ability to complete simple 3 step instructions, and the adaptive capacity to deal with routine changes, safety, and transportation. Id. On February 15, 2006, Dr. Thomas Reilly, a non-examining state agency psychologist, affirmed the opinions expressed in Dr. Hurley's PRTF and MRFCA. Id. at 328.

On December 13, 2005, Dr. Leslie Abramson, a non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment ("PRFCA"), in which she determined that Huse should avoid concentrated exposure to vibration, and could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for about six hours in an eight hour workday; sit for about six hours in an eight hour workday; push and pull without limitation; frequently climb; and occasionally balance, stoop, kneel, crouch, and crawl. Id. at 319-27. On February 16, 2006, Dr. Cynthia Short affirmed the opinions expressed in Dr. Abramson's PRFCA. Id. at 329.

-14-

On December 14, 2005, Dr. McLellan stated that he was discharging Huse from his practice and that he would defer to Huse's psychiatrist and psychologist regarding the impact of his ongoing depression and anxiety on his physical work capacity. Id. at 290-91.

On January 3, 2006, Dr. Renn examined Huse, who complained of depression and anxiety, and diagnosed him with depression. Id. at 342-43.

On January 17, 2007, Dr. Micha Hooper, examined Huse, who complained of depression and anxiety.  Id. at 344-47.  Dr. Hooper diagnosed Huse with major depressive disorder and a GAF score of 60.  Id.  On March 7 and 23, 2007, Dr. Hooper again examined Huse and each time diagnosed him with major depressive order and a GAF score of 60.  Id. at 351-54, 368.

On May 25, 2007, Ms. Lori P. Gurney, a licensed Psychologist, examined Huse, who complained of depression.  Id. at 375-77.  Gurney ruled out bipolar disorder and diagnosed Huse with major depression, post traumatic stress disorder, and a GAF score of 55.  Id. at 377.  Gurney also completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) form, in which she opined that Huse had a mild limitation in his

-15-

ability to respond to work situations and changes in a routine work setting, and moderate limitations in his ability to interact with supervisors and co-workers.  Id. at 378-79.  She also stated that Huse's anxiety and chronic pain and back injury prevented Huse from engaging in extended periods of driving, heavy lifting, and other job related duties.  Id. at 379.

On November 1, 2007, Dr. Ronald L. Green opined that Huse could not sustain any work activities of any kind due to back pain and depressive disease.  Id. at 388-89.

On July 19, 2007, Dr. Heather A . Wishart performed a cognitive psychological evaluation of Huse, who complained of memory loss with impulse control and anger issues.  Id. at 395-402.  Psychological testing indicated that Huse was experiencing moderate to severe mood symptoms which might be negatively affecting his cognitive abilities and functioning in daily life. Id. at 400.  Dr. Wishart recommended that Huse continue with psychological treatment.  Id. at 401.

D. **Administrative Evidence**

The record contains an undated Pain Report completed by Huse.  Huse reported continuous lower back pain and a lack of feeling in his right hand.  Id. at 68-75.  The record also

-16-

contains a Function Report completed by Huse on October 25, 2005 about his daily activities.  Huse reported the ability to perform personal care, do laundry, shop, walk, and drive, although those tasks could only be done for short period of time and sometimes required care or assistance.  <u>Id.</u> at 77-84.

**E.   <u>Hearing Testimony</u>**

Huse, who was represented by counsel, testified at the hearing and was questioned by the ALJ.  He stated that he had continuing psychiatric problems dating back to a motor vehicle accident in 1993 and marital problems in 1999.  <u>Id.</u> at 411-13. He also stated that he had undergone treatment and surgery for spinal problems, but still suffered pain in his legs and back; needed to be helped out of bed three times per week; and had trouble walking.  <u>Id.</u> at 413-14, 418-19.  Huse further testified that he had problems with memory, reading comprehension, dizzy spells, nausea, strength on his left side when walking, and sleeping.  <u>Id.</u> at 417-20.  He reported engaging in daily activities such as taking his son to school, working part-time, washing dishes, watching television, vacuuming with assistance, and going to medical appointments.  <u>Id.</u> at 421-22.  In addition, Huse testified that he took Trazadone to help him sleep, over-

-17-

the-counter medications for his back and leg pain, and Lithium
and Lorazepam for his psychiatric issues.  Id. at 415-16.  He
stated that he suffered nausea as a side effect of those
medications.  Id. at 416-17.

Huse's girlfriend testified at the hearing that Huse
appeared very stressed, was very forgetful, constantly complained
of back pain, couldn't sit or lie down for very long, had trouble
getting up from a sitting position, and was working part-time
driving a mail transport truck.  Id. at 440-44.

**F.   ALJ's Decision**

The ALJ conducted the five-step sequential evaluation
process set forth in 20 C.F.R. § 404.1520 to determine whether
Huse was disabled.  At step one, the ALJ determined that Huse had
not engaged in substantial gainful activity since the alleged
onset date of his disability.  At step two, the ALJ determined
that Huse suffered from back injuries and major depression that
collectively qualified as a severe combination of impairments.
At step three, the ALJ nevertheless determined that Huse was not
disabled under the Commission's listings of impairments.  20
C.F.R. Pt. 404, Subpt. P, App. 1.  In making these
determinations, the ALJ found that Huse experienced mild

restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace.  Id. at 18.

The ALJ determined at step four that Huse could not return to his past relevant work as a truck driver.  At step five, however, the ALJ concluded that Huse was not disabled because jobs exist in the national economy in significant numbers that Huse was capable of performing in spite of his impairments.  In making these determinations, the ALJ found that Huse had an RFC that allowed him to perform light work except for having to regularly interact with others.  The ALJ did not explain how, if at all, Huse's moderate difficulties with concentration, persistence, or pace affected his RFC.  Nor did the ALJ explain his decision to use the Grid rather than a vocational expert to make his step five determination except to state that "the additional nonexertional limitations have little or no effect on the occupational base of unskilled light work as evidenced by the claimant's current ability to perform on a part-time basis work activity in a job that the Dictionary of Occupational Titles classifies as medium exertional level work."  Id. at 21.

## II. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the decision of the ALJ.  My review is limited to determining whether the ALJ used the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

The ALJ's findings of fact are accorded deference as long as they are supported by substantial evidence.  Ward, 211 F.3d at 655.  Substantial evidence to support the ALJ's factual findings exist "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770.  The ALJ's findings are not conclusive, however, if they are derived by "ignoring

-20-

evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35.

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record. Irlanda Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the role of this court, to resolve conflicts in the evidence. Id.

## III.  ANALYSIS

Huse challenges the ALJ's RFC determination because he claims that it fails to account for Huse's moderate difficulties with concentration, persistence, or pace. He then argues that this failure requires that the case be remanded because it caused the ALJ to mistakenly rely on the Grid, which ordinarily cannot be used if a claimant suffers from significant nonexertional limitations.

**A.    The ALJ's Assessment of Huse's Residual Functional Capacity**

Social Security Ruling ("SSR") 96-8p requires an ALJ to consider both exertional limitations and nonexertional limitations when he determines a claimant's RFC. SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184,

at *6-7 (July 2, 1996).  In the present case, the ALJ found that Huse's mental impairments caused him to experience mild difficulty in activities of daily living, mild difficulty in social functioning, and moderate difficulty with concentration, persistence, or pace.  The only nonexertional limitation that the ALJ included in the RFC, however, was his  finding that Huse lacked the capacity to regularly interact with others.  This limitation plainly results from Huse's mild difficulty with social functioning rather than his more severe difficulty with concentration, persistence, or pace.  Although it is conceivable that a claimant's moderate difficulty with concentration, persistence, or pace might not cause functional limitations that would have to be reflected in an RFC in certain cases, the record in this case includes expert opinion evidence that Huse's mental impairments left him with the limited ability to carry out instructions of more than four steps.  Under these circumstances, the ALJ needed to explain how, if at all, Huse's moderate difficulty with concentration, persistence, or pace affected his RFC.  His failure to do so violates SSR 96-8p.

**B.   ALJ's Determination of Huse's Ability to Perform
     Other Work in the National Economy**

Huse next alleges that the ALJ erred in using the Grid
rather than a vocational expert to find that Huse could perform a
significant number of jobs in the national economy in spite of
his impairments.

If a claimant has nonexertional limitations, the Grid may
not be applied unless the ALJ makes a finding that the claimant's
nonexertional limitations are not significant.  See Heggarty v.
Sullivan, 947 F.2d 990, 995-96 (1st Cir. 1991).  If a
nonexertional impairment significantly affects the claimant's
ability to perform a full range of jobs he is otherwise
exertionally capable of performing, the Commissioner's burden
must be satisfied by other means, including the use of a
vocational expert.  Ortiz v. Sec'y of Health & Human Servs., 890
F.2d 520, 524 (1st Cir. 1989). However, if an otherwise
significant non-exertional impairment "has the effect only of
reducing that occupational base marginally, the Grid remains
highly relevant and can be relied on exclusively to yield a
finding as to a disability."  Id. (footnote omitted).  If a
nonexertional impairment is not significant and has only a

negligible effect, the ALJ should substantiate that finding with

evidence unless the matter is self-evident.  Seavey v. Barnhart,

276 F.3d 1, 7 (1st Cir. 2001).

In the case at hand, the ALJ determined that he could make

use of the Grid, because:

> The additional nonexertional limitations have little or
> no effect on the occupational base of unskilled light
> work as evidenced by the claimant's current ability to
> perform on a part-time basis work activity in a job
> that the Dictionary of Occupational Titles classifies
> as medium exertion level work.

Tr. at 21.  The Commissioner argues that this explanation

justifies the ALJ's decision to use the Grid because it is a

finding that Huse's nonexertional limitations were insignificant.

I am unpersuaded by the Commissioner's argument for two

reasons.  First, because the only nonexertional limitation that

the ALJ included in Huse's RFC was his determination that Huse

lacked the ability to regularly interact with others, the ALJ's

insignificance finding can only pertain to this limitation.  It

cannot excuse any undisclosed limitations that resulted from

Huse's moderate difficulties with concentration, persistence, or

pace.  Second, the ALJ's insignificance finding cannot stand even

if he intended it to address Huse's difficulty with

concentration, persistence, or pace because he failed to adequately justify any such finding.  The only way in which the ALJ substantiated his finding was by noting Huse's ability to perform medium exertion level work on a part-time basis. However, proof of the ability to engage in part-time work does not adequately substantiate a finding that a claimant's difficulties with concentration, persistence, or pace are insignificant.  This is because difficulties with concentration, persistence, or pace might significantly impact an individual's ability to perform work on a regular and continuing basis that he would otherwise be able to perform without incident on a part-time basis.  Accordingly, even if the ALJ had intended his insignificance finding to encompass any functional limitations resulting from Huse's moderate difficulty with concentration, persistence, or pace, his finding would not have been supported by substantial evidence.[2]

---

[2] Although the First Circuit has held that moderate limitations in maintaining attention and concentration do not preclude use of the Grid, see Ortiz, 890 F.2d at 526-527, in the instant case, reliance on the Grid as the exclusive basis for determining that Huse was capable of performing jobs in the national economy was inappropriate because the ALJ failed to undertake any thoughtful evaluation of the significance of Huse's difficulty with concentration, persistence, or pace.

### IV. **CONCLUSION**

For the foregoing reasons, I grant in part Huse's motion to reverse (Doc. No. 11), deny the Commissioner's motion to affirm (Doc. No. 12), and remand this case to the Social Security Administration.  The clerk is directed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

October 16, 2008

cc:  Raymond J. Kelly. Esq.
     Robert J. Rabuck, Esq